UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TARE NICHOLAS BELTRAN,

        Petitioner,

    v.

RON DAVIS, Warden,

        Respondent.

Case No. 14-cv-03027-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Tare Nicholas Beltran, challenging the validity of his state court sentence.  Respondent has filed an answer to the petition.  Petitioner has filed a traverse.  For the reasons set forth below, the Court will deny the petition.[1]

## I.  PROCEDURAL HISTORY

      By information filed November 21, 2007, the San Francisco District Attorney charged Petitioner with willful, deliberate, premeditated murder, Cal. Penal Code § 187(a).  The information further alleged that Petitioner used a deadly weapon, a knife, in the commission of the crime, *id.* at § 12022(b)(1).  *See* Respondent's Exhibit A at 578–79 (Clerk's Transcript, hereinafter referred to as "CT").

      On September 30, 2008, the jury acquitted Petitioner of first-degree murder, but found him guilty of second-degree murder.  The jury also found true the weapon use allegation.  On December 12, 2008, the trial court sentenced Petitioner to fifteen years to life in state prison, with

---

[1] Petitioner named Kevin Chappell, former warden of San Quentin State Prison — where Petitioner is incarcerated — as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ron Davis, the current warden of San Quentin State Prison is hereby SUBSTITUTED as respondent in place of Petitioner's prior custodian.

United States District Court
Northern District of California

an added one-year term for the use of the knife.  CT at 1517–18, 1521, 1685–87.

On March 30, 2011, the California Court of Appeal reversed Petitioner's judgment in an unpublished decision.  *People v. Beltran*, No. A124392, 2011 WL 1167916 (Cal. Ct. App. 2011) [hereinafter *Beltran I*].  The California Supreme Court granted Respondent's petition for review of the court of appeal decision.  *See* Respondent's Exhibit E, Order Granting Petition.  On review, in a published decision issued June 3, 2013, and modified on denial of rehearing on August 28, 2013, the California Supreme Court reversed the state appellate court's decision and remanded to that court for further proceedings.  *See People v. Beltran*, 56 Cal. 4th 935 (2013) [hereinafter *Beltran II*].  On December 11, 2013, on remand from the California Supreme Court, the California Court of Appeal affirmed Petitioner's judgment in an unpublished decision.  *See People v. Beltran*, No. A124392, 2013 WL 6498987 (Cal. Ct. App. Dec. 11, 2013) [hereinafter *Beltran III*].  The California Supreme Court denied review on March 19, 2014.  *See* Respondent's Exhibit I.

On July 2, 2014, Petitioner filed the instant federal petition.  *See* Docket Nos. 1 and 2.  On October 22, 2014, the Court issued an order to show cause.  *See* Docket No. 9.

## II.  FACTUAL BACKGROUND

The California Court of Appeal, in its December 11, 2013 decision affirming the judgment on remand, summarized the background relevant to the instant proceedings as follows:

### A. Appellant's Relationship with the Victim

In November 1998, appellant met a woman named Claire Joyce Tempongko at a bar. About a month later, they began dating. In mid-January 1999, appellant moved into the apartment that Tempongko shared with her school-age son, J.N. [FN 1], and toddler daughter. Appellant sometimes referred to Tempongko as his wife, and J.N. addressed and referred to appellant as "dad," even though appellant was not his father. According to appellant, he and Tempongko discussed the possibility of having a child of their own. She told him she was somewhat hesitant, because she was afraid he would abandon her as the fathers of her existing children had done, but he denied that she ever told him that she did not want to have a child with him because he was abusive. Eventually, according to appellant, they agreed that she would try to become pregnant, but she never told him that she had succeeded.

> FN 1: To protect the privacy of Tempongko's son, an innocent bystander who was a minor at the time of the crime, we will refer to him by his initials.

Appellant's relationship with Tempongko was "off and on again," had "ups and down[s]," and was marred by domestic violence almost from the start. In June 1999, appellant was convicted of felony domestic violence and put on probation. At

United States District Court
Northern District of California

appellant's trial, over the objection of his counsel, and subject to limiting instructions by the court, the prosecution introduced evidence of three domestic violence incidents between appellant and Tempongko, and of appellant's subsequent violation of a protective order.

***1. The April 28, 1999 Incident.*** On April 28, 1999, Tempongko called the police from a pay phone half a block from her apartment. When San Francisco police officer Laxman Dharmani arrived, Tempongko and J.N. appeared to be frightened. Tempongko told Dharmani that appellant had come to her apartment demanding to be let in, and that when she refused, because she was afraid of him, he made a commotion and broke a rear window. [FN 2] Tempongko explained to Dharmani that she had then let appellant into the apartment, because she was embarrassed by the scene he was making, but once he was inside, she told him he was no longer welcome there. He began gathering his belongings, but then suddenly grabbed her and threw her to the ground. When Tempongko got up, appellant grabbed her by the hair and pulled her along a hallway, but then let her go and drove away in the couple's pickup truck. [FN 3] Shortly after that, appellant left Tempongko a voicemail message saying that he would be back. Tempongko then called the police. She told Dharmani that she was afraid of appellant, but when Dharmani suggested that she go to a friend's or relative's house, she declined to leave home.

> FN 2: Appellant testified that the window was already cracked, and that he was only knocking on it when it broke.

> FN 3: In appellant's own testimony, he admitted grabbing Tempongko by the arm or shoulder, but did not recall ever pulling her by the hair. J.N., however, remembered seeing appellant drag his mother down a hallway by her hair on this occasion.

***2. The May 17, 1999 Incident.*** About three weeks later, during the late evening on May 17, 1999, Tempongko and appellant, riding in a limousine they had rented, picked up a friend of appellant's named Teofilo Miranda and took him to a nightclub. The two men drank alcohol in the limousine, and then had two or three beers at the club. After they had been at the club for a while, several men at an adjacent table commented about how Tempongko loved to dance. Appellant appeared to Miranda to become jealous, and got into an argument with the men. The club's security guard then told appellant, Tempongko, and Miranda to leave. They did so, and headed for Miranda's house. On the way, a truck came close to hitting them as they were crossing the street, and appellant got angry and threw a beer bottle at it.

After that, according to Miranda, appellant got into a bad mood. After the group had sat talking for a little while at Miranda's apartment, appellant asked Miranda to call a taxi so that he could go home, and told Tempongko she was to come with him. Tempongko told Miranda that she did not want to go in the taxi with appellant because she was afraid he would hit her, and asked him several times not to let appellant take her away. When the taxi arrived, Tempongko threw herself onto the floor, crying. Appellant took hold of her and tried to pick her up and remove her from Miranda's apartment, but was not able to do so. Miranda tried to persuade appellant to let Tempongko go, and then called the police. The tape recording of Miranda's 911 call was played for the jury; in the background, Tempongko could be heard calling out for help. When the police arrived, Tempongko was "shaking, crying, [and] hysterical," and told them she did not want to be left alone with appellant. Appellant was detained.

The following afternoon, the police photographed Tempongko's arms and legs, which were bruised where appellant had grabbed her. At trial, appellant admitted causing the bruises on Tempongko's arm, but did not recall grabbing her by the leg. He contended he was trying to pick Tempongko up off the floor, even though she did not want him to do so, because the taxi was waiting for them. He remembered her asking for help, but did not recall her telling Miranda that she was afraid he would beat her.

***3. The November 18, 1999 Incident.*** On November 18, 1999, the police, including officer John Tack, were called to Tempongko's apartment by Tempongko's mother, who told them that her daughter had gotten into a fight with her boyfriend, and he had beaten her. [FN 4] When they arrived, they found the bedroom door closed, and either locked or blocked shut. After repeated requests, appellant opened it a few inches, enabling the police to force it open and pull appellant out of the room. He smelled of alcohol. Tempongko was inside the bedroom, distraught. The police saw many empty beer cans or bottles scattered about in the living room.

> FN 4: The jury was instructed that Tempongko's mother's statement was introduced only to explain why the police entered the apartment, and not for its truth.

Tempongko told the police that she and appellant had been drinking to celebrate their one-year anniversary, and had gotten into an argument, during which appellant grabbed Tempongko by the hair and held her with her head pulled back for several seconds. After appellant released Tempongko, she left to get her mother and stepfather, who came back to the apartment with her. Appellant argued with them and yelled at them, and Tempongko's mother left, saying she was going to call the police. Appellant then forced Tempongko into the bedroom and locked her in along with him for about five minutes. [FN 5] Tempongko did not appear to be injured.

> FN 5: Appellant acknowledged grabbing Tempongko and taking her into the bedroom with him, but denied locking the door.

***4. The Protective Order Violation.*** At some point prior to September 7, 2000, Tempongko obtained an emergency protective order requiring appellant to stay at least 100 yards away from her apartment. However, he still had a key.

On September 7, 2000, the police were dispatched to Tempongko's apartment building. When they arrived, they saw appellant on the street, lurking in the shadows near the door of the building. The police detained him, and observed that he was slightly disheveled, had bloodshot eyes and slurred speech, and smelled of alcohol. He was arrested because he appeared to be so intoxicated as to pose a danger to himself or others. The police knocked on Tempongko's door, and she told them about the emergency protective order. She appeared to be frightened, and "became almost panic stricken" when the police told her that they had detained a man outside the building.

According to appellant, he had come to Tempongko's apartment, uninvited and unannounced, because he wanted to see the children, and Tempongko called the police when he rang the buzzer and called her name. He did not use his key because Tempongko was not expecting him. He admitted knowing at the time that there was a protective order prohibiting him from coming within 100 yards of Tempongko's apartment.

4

**B. The Homicide**

In early October 2000, appellant started living "off and on" in a room in an apartment in another neighborhood, which he rented from a man named Oscar Sanchez, whom he knew through a mutual friend. Sanchez testified that appellant told Sanchez only he had been "thrown out" of his prior residence; appellant did not explain further. According to appellant, Tempongko never told him that she wanted to end their relationship; rather, he moved out because he and Tempongko "mutually decided to take a timeout to kind of reevaluate our relationship." In an employment application that appellant filled out on October 13 or 15, 2000, he gave Tempongko's address and telephone number as his own.

Around the same time that appellant moved out of Tempongko's apartment, she started dating a man named Michael Houtz, whom she had known as a friend since January 2000. Shortly before they started dating, Tempongko told Houtz that she had finally gotten appellant to break up with her, as she had wanted to do since January 2000. Tempongko told Houtz that appellant had told her the relationship would end only "over his dead body [or] over her dead body."

During the morning of October 22, 2000, which was a Sunday, Houtz picked up Tempongko and her children (then aged 10 and 5) for a planned excursion to Sacramento to get Halloween costumes for the children. Meanwhile, according to Sanchez, appellant's roommate, appellant spent most of that morning drinking; he and Sanchez consumed 24 to 36 cans of beer between the two of them. Appellant testified that he thought he drank nine cans of beer, but he was not positive.

As both Sanchez and appellant recalled, Tempongko called around noon on October 22, 2000, and when Sanchez answered the telephone, she asked for appellant. Sanchez gave appellant the phone, and a 10–minute conversation ensued, during which Sanchez testified that appellant was calm and did not use any profanity. According to appellant, Tempongko called him that day because they were supposed to have lunch. Instead, she told him that some female friends were taking her and the children to buy Halloween costumes, but she said she would still see him later in the day, and asked him to call her in the afternoon to find out when she would be home. After the call, appellant showered, dressed, and left the apartment.

After stopping at Houtz's house in Vallejo, Houtz, Tempongko, and her children arrived in Sacramento at about 2:45 p.m. As they were getting out of the car, Tempongko's cell phone rang. According to Houtz, Tempongko's son, J.N., took the phone out of her purse, answered it, and then handed it to Tempongko, saying, "Dad is mad." Houtz could hear a male voice on the other end of the call, speaking extremely loudly to Tempongko. Houtz could not understand what Tempongko was saying to the caller, because she was not speaking in English. After a minute or two, she yelled into the phone and hung up. J.N. remembered his mother getting what he considered an unusual number of calls on her cell phone during the Sacramento outing. However, he did not recall answering the phone himself, or knowing the identity of any of the callers.

Both Houtz and J.N. recalled that after receiving the telephone call, Tempongko's mood changed; she had been acting happy and carefree earlier, but after the call, she appeared to J.N. to be nervous, and to Houtz to be apprehensive and upset, or at least embarrassed. Nonetheless, Houtz, Tempongko, and the children went on with their excursion. Shortly after the call, Tempongko told Houtz that the call had come from "him," which Houtz understood to mean Tempongko's boyfriend or former boyfriend. Tempongko complained that he was "bothering" her.

Appellant testified that he called Tempongko around 3:00 p.m. that day from a pay phone. His recollection was that it was not J.N., but Tempongko herself, who answered the call. Appellant acknowledged that he might have spoken loudly, due to the background noise near the pay phone, but averred that he was not upset and did not yell, nor was he angry or upset at Tempongko for changing their plans. She told him she would call him later. Appellant testified that he did not tell her to be home by 7:00 p.m., and that they did not agree she would be home by any specific time. He also denied knowing anything about her having met a new male friend, or started dating another man.

When Tempongko and Houtz planned their shopping excursion, she had told Houtz that she would need to be home by 7:00 p.m. During the trip back, Tempongko received a few more calls on her cell phone, during which she spoke to the caller or callers in Tagalog, and sent at least one other call directly to voicemail. She appeared to Houtz to be "fidgety" and concerned about the time, but she told him not to worry. When they neared her apartment at about 6:45 p.m., Tempongko appeared to Houtz to become alarmed by the sight of a green Honda parked near the door of her building, with a man who looked Caucasian or Hispanic sitting slumped down in the driver's seat. [FN 6] Tempongko told Houtz not to stop, and to drive around the block. As they did so, Tempongko scanned the area carefully. When they returned to her street, the car was still there, and Tempongko became very frightened, and told Houtz to drive around again, this time in a larger circle.

> FN 6: The prosecution argued that the man in the car was appellant. Appellant denied having a car at that time, and testified that he traveled to Tempongko's that evening by bus, and had not been in a car waiting for Tempongko to arrive. Christina Maldonado, who lived on the top floor of the three-unit building in which Tempongko had the basement apartment, recalled that appellant had a car, but was not certain of the make or model. In an interview with the police on October 24, 2000, Houtz told the police that the car was a green four-door Honda Civic, and that Tempongko said she had also seen the same car in front of her house a month earlier.

After they circled the block a third time, the green Honda was gone, but Tempongko remained tense, and asked Houtz to circle around one more time. At the end of this fourth circuit, Houtz pulled into a driveway next to Tempongko's building. Tempongko and the children got out of the car quickly, without saying goodbye; ran into the building, and shut the door. Shortly after that, Houtz tried to call Tempongko from his cell phone, both at her home telephone number and on her cell phone. According to Houtz, J.N. answered the home phone, said his mother was not home, and hung up. The cell phone rang straight through to voicemail. Houtz then drove by the apartment to check on them, and noticed a man sprinting away from the side of the street on which Tempongko lived. [FN 7] Everything appeared all right when Houtz checked the front door, however, so he headed home. While driving home, and soon after he arrived, Houtz tried several more times to reach Tempongko on her cell phone, but was only able to reach her voicemail.

> FN 7: According to the notes the police took of their interview with Houtz on October 24, 2000, he did not mention that Tempongko told him to circle the block several times when they came back to her apartment, nor did he mention seeing a man run away from the vicinity. He merely told them that he had dropped her off at 6:45 p.m.

In contrast to Houtz's testimony, appellant introduced the testimony of Flor Yee. Yee lived a block away from Tempongko, and her daughter was a school friend of Tempongko's daughter. Yee testified that Tempongko and her children stopped by to see her for about 10 minutes between 4:00 p.m. and 6:00 p.m. on October 22, 2000. Yee said that Tempongko and the children seemed happy at the time, and said they had been to Vallejo that day. Later the same evening, around 8:00 or 9:00 p.m., J.N. came over to Yee's house terrified and crying because his mother had just been killed. He was there for about 20 minutes, and then the police came.

J.N., who was 18 years old by the time of appellant's trial, testified about what happened inside Tempongko's apartment that evening. He said that his mother's cell phone rang several times, but he did not hear the conversations, except that at around 8:15 or 8:30 p.m., he heard his mother arguing with the caller, sounding frantic or at least upset, and urging the caller not to come to the house. [FN 8]

> FN 8: In an interview recorded in 2007, J.N. said he was not sure whether his mother told the caller to come to the house, or not to do so.

Some 30 to 45 minutes later, appellant opened the apartment door with a bang, entered the apartment without being let in by Tempongko or her children, and began yelling loudly at Tempongko, angrily asking her where she had been, and with whom. Tempongko did not answer him. According to J.N., she did not push or strike appellant, and J.N. did not remember her swearing at him. After appellant yelled at Tempongko and they argued for about five or ten minutes, something appeared to J.N. to "trigger" appellant. Appellant walked very quickly into the kitchen area and grabbed a large kitchen knife with a six-inch blade. When appellant came back to the living room, he angrily approached Tempongko and began stabbing her repeatedly. She retreated, fell back onto the couch, put up her arms to try to push appellant away, and tried to grab the knife, but appellant kept stabbing her. After Tempongko slid to the floor, appellant stabbed her a few more times, and then ran out of the apartment, still carrying the knife.

Appellant's version of these events differed in several respects from J.N.'s. Appellant testified that he arrived at about 8:40 p.m., and let himself in with the key he still had. He did not knock, because they were expecting him. He denied being angry when he arrived, or banging the door. Appellant maintained that Tempongko was upset with him for coming over so late, but he acknowledged that she never physically assaulted him during their argument. Appellant said Tempongko also criticized him for taking a job washing dishes, at which point they began to argue about money and exchange angry insults. Tempongko called appellant an "illegal" and a "nobody," and said she could "do better" than him.

According to appellant, he then said he was leaving, and this only made Tempongko even more angry. Finally, she yelled, "'Fuck you. I was right. I knew you were going to walk away someday. That's why I killed your bastard. I got an abortion.'" [FN 9] Appellant testified that he had not known Tempongko was pregnant or that she had an abortion, and that learning this shocked him so much that he had no recollection of what happened next, until he found himself holding a bloody knife, with blood on his hands. Still in shock, he looked at the children, and then ran out of the apartment, holding the knife, which he threw away. [FN 10] He admitted taking Tempongko's cell phone, explaining that she handed to him while they were arguing, urging him to call her friend if he did not believe her about where she had been. [FN 11]

> FN 9: This aspect of appellant's version of the events was corroborated by portions of Tempongko's medical records introduced into evidence by the

defense, which established that she had an abortion on July 13, 2000.

FN 10: Later that evening, the police found a knife, with Tempongko's blood on it, on the sidewalk at a street corner near her apartment building. A passerby had earlier seen a Hispanic man near that location, running very fast in the middle of the street, cursing and muttering to himself in English and Spanish, and carrying a knife with a five-inch to seven-inch blade. The passerby was not able to identify appellant as that man, however.

FN 11: The prosecution introduced business records showing that eight calls were made from Tempongko's cell phone starting at 9:13 p.m. on October 22, 2000, which was several minutes after the police arrived at Tempongko's apartment in response to Maldonado's 911 call. Appellant admitted using the phone to make several calls, including one to his sister in San Rafael. Some of the calls went to the phone number of appellant's acquaintance Chili Bowles.

Maldonado, Tempongko's neighbor on the top floor, testified that during the evening on October 22, 2000, she heard sounds of a struggle coming from Tempongko's basement apartment, with what sounded like furniture being knocked over or someone being thrown against a wall. She heard a muffled male voice, but did not hear a female voice. She also heard the children screaming, and calling frantically to their mother that they loved her.

After listening for a couple of minutes, Maldonado looked down the inside stairwell of the building and saw J.N. running out of the apartment toward the sidewalk. At that point, she left her apartment by the front door with her cordless phone in her hand. As she did so, she saw the occupant of the apartment on the middle floor of the building, Frederick Keagy, standing outside the door with J.N. Keagy had just been driven home by two friends, and encountered J.N. at the street door of the passage leading to Tempongko's apartment. J.N. was crying hysterically, and called to Keagy that his mother was hurt, their phone was not working because the cord had been cut or "messed up," and he needed to call for help. J.N. told Keagy, "He stabbed my mom," and "he ran away." Keagy did not ask J.N. who "he" was, but J.N. told Keagy's friend Gregory Stork that it was J.N.'s "dad," his mother's boyfriend. Keagy started up the stairs to get to a phone, but on the way, he encountered Maldonado. He told her to call 911, which she did.

Meanwhile, Keagy and Stork went into Tempongko's apartment and saw her propped up in the corner by the couch, surrounded by blood, and barely breathing. Furniture had been knocked over, and according to Keagy and Stork, the telephone had been detached from the wall and was on the floor. Keagy recalled the telephone cord being next to Tempongko; Stork testified that it was "sort of all over" her. Maldonado also went into Tempongko's apartment after placing the 911 call, and saw the phone jack still on the wall, but with no telephone connected to it. She did not recall seeing the cord on Tempongko's body.

Appellant denied pulling any telephone cord out of the wall, or at least did not remember doing so, and testified that he did not recall there being any telephone in the apartment other than the cordless telephone in the bedroom. [FN 12] The statements that Keagy, Stork, and Maldonado wrote out for the police on the night Tempongko was killed did not include any information regarding the telephone or the telephone cord. These witnesses testified at trial, however, that their statements were not necessarily a complete account of everything they saw. J.N. and Maldonado also both testified that the apartment had a land line telephone, with a cord, mounted on the wall near the front door, although Maldonado did not recall

when she had last seen it. J.N. did not recall appellant doing anything to the wall-mounted telephone on the night Tempongko was killed, but he did remember that he tried to use it to call for help after the stabbing, and it was not working.

> FN 12: The crime scene photographs taken after Tempongko was killed showed a cordless phone base in one of the bedrooms, and a matching telephone handset on the bed.

The police report and the investigating officers' chronology did not mention anything about a telephone or a telephone cord at the scene of the homicide. However, crime scene photographs taken at the time showed a telephone cord on the floor, as well as the telephone jack in the wall. The officer who took the photographs opined that it looked as though the cord had been pulled out of the wall jack.

Dr. Boyd Stephens, who was the chief medical examiner for San Francisco at the time of the homicide, performed an autopsy on Tempongko on October 23, 2000. Stephens died in the spring of 2005, shortly after his retirement. In his stead, the prosecution called Dr. Amy Hart, Stephens's successor. Based on the autopsy report, an accompanying diagram, and photographs of Tempongko's body, Hart testified that Tempongko received 17 "sharp force injuries" that were consistent with wounds that could be inflicted by the knife found near Tempongko's apartment, as well as 4 blunt force injuries. Some of the sharp force injuries were wounds on Tempongko's hands that Hart characterized as "defensive," that is, as injuries that could have been sustained by someone trying to ward off an assault with a sharp weapon. Hart testified that in her opinion, based on the records that she reviewed, Tempongko died of hypovolemic shock, which is the medical term for what happens when someone bleeds to death.

## C. Appellant's Actions After the Homicide

Sometime after 9:00 p.m. on the night Tempongko was killed, appellant showed up at a bar in the Tenderloin where he was a regular patron. According to appellant, he flagged down a taxi in Tempongko's neighborhood, and had it take him to the bar so he could look for his only close friend, Ezequiel Perez. While appellant was in the taxi, he realized that he had taken Tempongko's cell phone with him, because it rang. He turned it off without answering it, [FN 13] though he turned it back on later to make outgoing calls.

> FN 13: This testimony was consistent with Houtz's statement that he tried to call Tempongko's cell phone some time after he dropped her off, but only reached her voicemail.

When appellant arrived at the bar, both the owner and the bartender noticed that appellant had blood and scratches on his hand, and blood on his shirt. Appellant appeared nervous, and told them he had gotten into a fight outside the bar. Appellant went to the bar's restroom, where he cleaned up; he also asked if the bar owner had an extra shirt he could put on, and after the owner found one, he changed into it. Appellant told the bar owner that the police were looking for him, and obtained permission to use the bar's phone so he could call a friend.

Shortly thereafter, appellant's friend Perez met him at the bar. They went outside the bar and called Bowles, who was a close friend of Perez's, to ask him for a ride; they then left the immediate area of the bar. Bowles picked up appellant and Perez, and took them to his apartment in San Bruno, where they spent the night. At about 2:00 a.m. on October 23, 2000, appellant called his roommate, Sanchez, and told

1    Sanchez in Spanish that he had done something wrong.

2    The following evening, Bowles drove appellant to a convenience store or
     laundromat somewhere north of the Golden Gate Bridge. At the store, appellant
3    met briefly with his sister, spoke with her for a few minutes, embraced her, and
     then left with Bowles. Appellant testified that he met with his sister to say goodbye
4    to her, and to ask her, when she found out what he had done, to explain it to their
     mother. Later that evening, appellant asked Bowles to take him to the Greyhound
5    bus station in San Francisco, where appellant caught a bus to Los Angeles, telling
     Bowles that he was heading for Mexico. According to appellant, he went to Mexico
6    at Perez's suggestion, because he was afraid. Appellant remained in Mexico until
     he was apprehended in June 2006, and returned to San Francisco in 2007.

7    *Beltran III*, 2013 WL 6498987, at *1–*8.

8                               **III. DISCUSSION**

9    **A.     Standard of Review**

10         A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death

11   Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus

12   "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that

13   he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

14   § 2254(a).

15         A district court may not grant a petition challenging a state conviction or sentence on the

16   basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication

17   of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

18   application of, clearly established Federal law, as determined by the Supreme Court of the United

19   States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

20   light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v.*

21   *Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the

22   constitutional error at issue "'had substantial and injurious effect or influence in determining the

23   jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507

24   U.S. 619, 637 (1993)).

25         A state court decision is "contrary to" clearly established Supreme Court precedent if it

26   "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it

27   "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

28   Court and nevertheless arrives at a result different from [its] precedent."  *Williams*, 529 U.S. at

United States District Court
Northern District of California

10

United States District Court
Northern District of California

405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  The final state court decision from the California Supreme Court summarily denied Petitioner's second petition for review.  The California Court of Appeal, in its opinion on remand, was the only state court decision that addressed the seven claims Petitioner raises in the instant petition.  Accordingly, in reviewing Petitioner's habeas petition, this Court reviews the California Court of Appeal's decision on remand.  *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.[2]

//

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112-13 (9th Cir. 2003)).  The look through rule continues as the Ninth Circuit held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear."  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

**B.      Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) admission of the autopsy report and related evidence violated his rights under the Confrontation Clause; (2) admission of Tempongko's statements to the police violated his rights under the Confrontation Clause; (3) admission of past incidents of domestic violence violated his due process rights; (4) instructional error where the jury was instructed pursuant to CALCRIM 852; (5) admission of statements made by Tempongko to Houtz violated his rights under the Confrontation Clause; (6) the prosecutor committed misconduct by knowingly eliciting inadmissible testimony, thereby violating Petitioner's due process rights; and (7) cumulative error.  *See* Docket No. 2, Mem. of Pts. & Auth. in Support of Pet.

**1.      Confrontation Clause claims**

Petitioner argues that his rights under the Confrontation Clause were violated when the trial court admitted the following: (1) the autopsy report and related evidence; (2) Tempongko's statements to Officers Dharmani and Lack; and (3) Tempongko's statements to Houtz.  Pet. at 10–20 and 25–31.[3]

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It does not command that evidence be reliable, but rather that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

---

[3] All references to Petitioner's Memorandum of Points and Authorities in Support of his Petition are to the page numbers assigned to the document by Petitioner, which are located on the bottom of each page.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S.

2   at 50–51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of

3   establishing or proving some fact." *Id.* at 51 (quoting Webster, An American Dictionary of the

4   English Language (1828)); *see id.* ("An accuser who makes a formal statement to government

5   officers bears testimony in a sense that a person who makes a casual remark to an acquaintance

6   does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-

7   court statements introduced at trial, regardless of the admissibility of the statements under state

8   laws of evidence. *Crawford*, 541 U.S. at 50–51. For purposes of federal habeas corpus review,

9   the standard applicable to violations of the Confrontation Clause is whether the violation had an

10   actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir.

11   2002) (citing *Brecht*, 507 U.S. at 637).

12             **a.      Autopsy report and related evidence**

13   Petitioner argues that his rights under the Confrontation Clause were violated when the

14   trial court admitted (1) the autopsy report as a business record; (2) the related diagram and

15   toxicology report that were not part of the official autopsy report; and (3) the coroner's testimony

16   based upon or discussing the autopsy report, the diagram, and the toxicology report. Pet. at 16–19.

17   The state appellate court rejected this claim on remand as follows:

18           At the time of appellant's trial in September 2008, the United States Supreme Court
19           had decided *Crawford*, *supra*, 541 U.S. 36, but had not yet decided *Melendez–Diaz
             v. Massachusetts* (2009) 557 U.S. 305 *(Melendez–Diaz)*. In *Crawford*, the high
20           court held that a criminal defendant's Sixth Amendment right to confrontation
             precludes the admission of testimonial statements by a witness who is not subject to
21           cross-examination at trial, even if those statements fall within an exception to the
             hearsay rule. In *Melendez–Diaz*, the court applied this holding to preclude the
22           prosecution from relying on certificates setting forth the results of scientific tests on
             suspected controlled substances, holding that the prosecution was obligated,
23           instead, to produce the lab analysts who conducted the tests, so that the defense
             could cross-examine them.

24           In the present case, appellant relies on *Crawford*, *supra*, 541 U.S. 36, and
25           *Melendez–Diaz*, *supra*, 557 U.S. 305, in arguing that the trial court committed
             reversible error in admitting into evidence Hart's expert testimony in reliance on
26           Stephens's autopsy report, the related diagram, and photographs of Tempongko's
             body (collectively, the autopsy evidence). Appellant contends that the autopsy
27           evidence was prejudicial because the number, position, and depth of the stab
             wounds described in the autopsy evidence was relevant to the jury's determination
28           whether appellant's stabbing of Tempongko was "a calculated act" or "the result of
             a rash reaction" to Tempongko's provocation.

Respondent counters on three grounds. First, respondent contends the issue was forfeited due to appellant's counsel's failure to object on confrontation clause grounds. Second, respondent argues that the autopsy evidence was properly admitted under *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*), *overruled in part by Melendez–Diaz, supra*, 557 U.S. 305. Finally, respondent maintains that even if the admission of the autopsy evidence was error, it was harmless beyond a reasonable doubt.

When we issued our original opinion in this case, the California Supreme Court had not yet decided *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*). In *Dungo*, as in the case before us, the defendant admitted killing the victim, with whom he was romantically involved; argued that the killing was committed in the heat of passion and was therefore voluntary manslaughter rather than murder; and was convicted of second degree murder. The doctor who conducted the victim's autopsy was unavailable as a witness at the defendant's trial. Instead, the prosecution introduced the testimony of a forensic pathologist who "described to the jury objective facts about the condition of the victim's body as recorded in the autopsy report and accompanying photographs," and gave his own opinion as to the cause of the victim's death based on the report and photographs. (*Id.* at pp. 612, 614–615.)

The *Dungo* court held that this testimony was properly admitted, notwithstanding *Crawford, supra*, 541 U.S. 36, and *Melendez–Diaz, supra*, 557 U.S. 305. (*Dungo, supra*, 55 Cal.4th at p. 621.) The court reasoned that the statements in an autopsy report describing the condition of the body are not testimonial for Confrontation Clause purposes, because they "merely record objective facts" and "are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. [Citation.]" (*Dungo, supra*, at pp. 619–620, fn. omitted.) The court also noted that "[t]he usefulness of autopsy reports . . . is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes." (*Id.* at p. 621.) Thus, the court held that the testifying pathologist's description of the victim's injuries, based on the autopsy report, was admissible even though the autopsy had been performed by a different physician who was not subject to cross-examination. (*Ibid.*)

In the present case, as in *Dungo, supra*, 55 Cal.4th at page 612, neither the autopsy report itself, nor an accompanying diagram prepared by Stephens, were admitted into evidence. They were marked for identification as business records, and formed part of the basis for Hart's testimony, but they were withdrawn by the prosecutor before the case went to the jury. Photographs of Tempongko's body that accompanied the autopsy report were introduced in evidence, but appellant does not and could not argue the admission of the photographs alone violated the Confrontation Clause. [FN 19] (*See People v. Cooper* (2007) 148 Cal.App.4th 731, 746 [photographs are demonstrative evidence, and are neither hearsay nor testimonial]; *see also People v. Rountree* (2013) 56 Cal.4th 823, 852 ["We have consistently upheld the admission of autopsy photographs disclosing how the victim was wounded as being relevant to the question of deliberation and premeditation"].) Accordingly, *Dungo* is directly on point; the admission of Hart's expert testimony based on the autopsy documents was not error, even though Hart herself did not perform the autopsy.

       FN 19: Appellant's trial counsel objected unsuccessfully to the admission of the autopsy photographs under section 352, but he does not press this

argument on appeal.

*Beltran III*, 2013 WL 6498987, at *16–*17.

After carefully reviewing the record, the Court concludes that the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  As Respondent correctly points out, the United States Supreme Court has not addressed whether an autopsy report or any of its contents is "testimonial" for purposes of the Confrontation Clause.  Reflecting the lack of guidance from the Supreme Court, federal courts have disagreed as to whether, post *Melendez–Diaz*, autopsy reports should be treated as testimonial hearsay for purposes of the Confrontation Clause.  *See Hensley v. Roden*, 755 F.3d 724, 733–34 (1st Cir. 2014) (noting split of authority and citing state and federal cases).  Without the existence of clearly established federal law as determined by the United States Supreme Court, the state court's denial of this claim cannot be said to be contrary to, or an unreasonable application of, such law.  *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) (noting that lower courts' wide divergence in treatment of claim reflected "lack of guidance" from Supreme Court, and thus "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'") (alterations in original) (quoting 28 U.S.C. § 2254(d)(1)); *see also Kessee v. Mendoza–Powers*, 574 F.3d 675, 677 (9th Cir. 2009) (holding that state-court determination consistent with some federal courts' interpretation of Supreme Court precedent unlikely to be contrary to or involve an unreasonable application of clearly established federal law even if inconsistent with Ninth Circuit view).

Nor was the state appellate court's denial of this claim based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  The record does not support a finding that Dr. Hart merely acted as a conduit for the autopsy report and related diagrams; nor does the record support a finding that her opinion was "entirely dependent" upon the autopsy report and diagrams.  *See* Traverse at 4.  Rather, a significant portion of her testimony consisted of analyzing the photographs taken during the autopsy, *see* RT 922–46, 1368, which were properly admitted into evidence, *see United States v. Brooks*, 772 F.3d 1161, 1167 (9th Cir. 2014).  The autopsy report and the related diagrams were not admitted into evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

Moreover, under both California and federal law, an expert may base her testimony on matter that "is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [her] testimony relates," whether or not that testimony is admissible. Cal. Evid. Code § 801(b); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . . If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *People v. Gardeley*, 14 Cal. 4th 605, 618 (1996); *United States v. McCollum*, 732 F.2d 1419, 1422–23 (9th Cir. 1984).

Finally, even if the admission of Dr. Hart's testimony based upon the autopsy reports and diagrams were erroneous, the record does not support a finding that the admission had a substantial or injurious effect in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. Defense counsel relied upon Dr. Hart's testimony in closing argument in urging the jury to find that the killing was neither premeditated nor deliberate. *See* RT 1747–48. Accordingly, this habeas claim is denied.

### b.     Tempongko's statements to police officers Dharmani and Lack

Petitioner argues that his rights under the Confrontation Clause were violated when the trial court admitted Tempongko's statements to police officers Dharmani and Lack. Pet. at 13–20. The state appellate court rejected this claim on remand as follows:

> While appellant was still at large after Tempongko's killing, the United States Supreme Court held in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) that the admission of testimonial out-of-court statements, even if authorized by an exception to the hearsay rule, violates the confrontation clause. In ruling on the prosecution's proffer of Tempongko's out-of-court statements to police in the wake of appellant's acts of domestic violence, the trial court correctly understood that it was bound by *Crawford*'s holding. Nonetheless, appellant now argues that the trial court erred in applying that holding to the present case.
>
> In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the court clarified the term "testimonial," as used in this context, as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted.) At the same time, the court noted that it was not "attempting to produce an exhaustive classification of all conceivable statements" as testimonial or nontestimonial.

16

(*Ibid.*)

*Davis*, *supra*, 547 U.S. 813, was decided together with a consolidated companion case, *Hammon v. Indiana* (2006) 547 U.S. 813 (*Hammon*). In *Davis*, the Supreme Court held nontestimonial, and therefore admissible, tape recorded statements made by a domestic violence victim during a 911 call, in which the victim responded to the 911 operator's questions by identifying her assailant as the defendant, and describing what he was doing to her as the call progressed. (*Davis*, *supra*, 547 U.S. at pp. 817, 828–829.) In *Hammon*, police officers responding to a domestic violence call encountered the victim alone on the front porch of her home, appearing frightened, but denying that anything was wrong. After the officers entered the home, one of them questioned the victim outside the defendant's presence, asking her what had happened. She responded that the defendant had thrown her down onto broken glass and punched her in the chest. The Supreme Court held that because there was no ongoing emergency at the time, and no continuing immediate threat to the victim, the statements were obtained for the purpose of investigating a past crime, rather than to guide police who were intervening in an ongoing emergency. Thus, the statements were testimonial, and their admission was barred by the confrontation clause. (*Hammon*, *supra*, 547 U.S. at pp. 820–821, 830.)

In analyzing application of *Davis*, *supra*, 547 U.S. 813, and *Hammon*, *supra*, 547 U.S. 813, to the facts of the present case, we must be guided by our own Supreme Court's interpretation of *Davis* in *People v. Cage* (2007) 40 Cal.4th 965. In that case, the court noted that in order for an unsworn statement to be testimonial, "it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." (*Id.* at p. 984, fn. omitted.) The statement also "must have been given and taken primarily for the purpose ... [of] establish[ing] or prov [ing] some past fact for possible use in a criminal trial," an issue that is "to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants." (*Ibid.*, original italics.) Consistent with these principles, responding to questions from police "in a nonemergency situation, ... where deliberate falsehoods might be criminal offenses," is testimonial; however, "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Ibid.*)

In the present case, appellant contends that the trial court erred in concluding that some of the statements Tempongko made to the police who came in response to her calls about appellant's domestic violence were not testimonial as that term was clarified in *Davis*, *supra*, 547 U.S. 813. Specifically, appellant argues that the following evidence should have been excluded: (1) police officer Dharmani's testimony that after he responded to Tempongko's 911 call on April 28, 1999, she told him that appellant had broken a window in her apartment after she refused to let him in; that when she finally let him in, he threw her to the ground, pulled her by her hair, and then left; and that he later left a telephone message threatening to return; and (2) police officer Tack's testimony that when he responded to Tempongko's mother's call to the police on November 18, 1999, and forced open the door to Tempongko's bedroom, Tempongko told him that appellant had grabbed her by the hair and pulled her head back, causing her to leave the apartment to get her mother and stepfather, and that when she returned with them, appellant forced her into the bedroom and locked the door. Appellant argues that because there was no ongoing emergency at the time these statements were made, and the statements concerned past events rather than a currently developing situation, the statements were testimonial in nature.

Respondent counters by arguing that the facts of this case are more similar to those in *Davis*, *supra*, 547 U.S. 813, than to those in *Hammon*, *supra*, 547 U.S. 813, and by citing two post-*Davis* California Court of Appeal cases involving similar facts. In one, *People v. Saracoglu* (2007) 152 Cal.App.4th 1584 (*Saracoglu*), a woman and her child came to a police station and spoke to two officers there. The woman was nervous, crying, upset, and scared, and had visible cuts and bruises. She told the police that about 30 minutes earlier, the defendant had choked, pushed, hit, and threatened her, and told her he would shoot her if she went to the police. She explained that she had come to the police station because she was afraid of the defendant, and accepted the officers' offer to get her an emergency protective order. The officers then went to her home and arrested the defendant.

The woman failed to appear to testify at the defendant's trial, so the trial court permitted one of the police officers to testify at trial about what the woman told him at the police station. (*Saracoglu*, *supra*, 152 Cal.App.4th at p. 1587.) The Court of Appeal upheld the trial court's ruling. In so doing, the court rejected not only the defendant's contention, but also the Attorney General's concession that the woman's statements were testimonial because they described events that had already occurred. (*Id.* at pp. 1596, 1598.) Rather, the court concluded that "[o]bjectively viewed, the primary purpose of [the woman]'s initial interrogation by [the officer] was 'to deal with a contemporaneous emergency, rather than to produce evidence about past events....' [Citation.]" (*Id.* at p. 1597.) The court noted that the woman told the police that the defendant had threatened to kill her if she went to them. This implied that she could not return home without facing that threat; thus, her visit to the police station constituted part of an ongoing emergency situation. (*Ibid.*) In short, the woman's "primary purpose for making her initial statements to [the officer] was to gain police protection," rather than to report a past crime. (*Id.* at p. 1598.)

The second case on which respondent relies, *People v. Banos* (2009) 178 Cal.App.4th 483 (*Banos*), involved a defendant who was accused of killing his ex-girlfriend after a history of domestic violence. The prosecution offered evidence of statements that the victim made to police on five occasions: (1) during a meeting with a police officer in the victim's apartment, in which she related that the defendant had punched and threatened her earlier that day, and then called while she was waiting for the police to arrive and threatened to kill her; (2) during another meeting with the same police officer later the same day, in which the victim told the officer that the defendant had come back to her apartment after the officer left, and had hit her and threatened her again; (4) during a 911 call in March 2004, in which the victim told the dispatcher that the defendant was inside the victim's apartment, in violation of a restraining order, and that she was afraid he would attack her; and (5) during a conversation with the officer who responded to the same 911 call, in which the victim reiterated what she had told the dispatcher. (*Id.* at pp. 491–492.)

The *Banos* court held that the victim's statements during the March 2004 call to 911, and her statements to the officer who responded to the call, were admissible as non-testimonial because the victim's "primary purpose for making the statements to the 911 dispatch officer was to gain police protection" in the context of an "ongoing emergency." (*Banos*, *supra*, 178 Cal.App.4th at p. 497.) The court held that the other three statements were testimonial for confrontation clause purposes, however, because on each occasion, the victim was reporting past events at a time when there was no ongoing emergency. On the first occasion, the victim was home, the defendant was not present, and the victim was upset, but not distraught. On the other two occasions, the defendant had already been detained by the police when

the victim gave them her version of the events. (Id. at pp. 497–498.) [FN 15]

> FN 15: The court held that the statements were nonetheless admissible under the forfeiture by wrongdoing exception to the confrontation clause. (*Id*. at pp. 498–504.) That issue is not presented in this case.

Applying the principles set forth in the cases discussed above to the facts of the present case, we conclude that Tempongko's statements to Tack on November 18, 1999, were properly admitted. The police arrived to intervene in what they were told was an ongoing episode of domestic violence, and had to force open the door to Tempongko's bedroom. Tempongko's statements to them were made moments after the police arrived, and while appellant was still present in Tempongko's apartment. When the police spoke with Tempongko, they were in the process of determining what action they needed to take in order to protect her from possible harm. Accordingly, objectively viewed, Tempongko's statements were made primarily to inform the police in their efforts to deal with an ongoing emergency, and thus were not testimonial.

In contrast, Tempongko's statements to Dharmani on April 28, 1999, were made after appellant's assault on Tempongko had already concluded, and he had left her apartment. Tempongko was standing on a public street when she spoke to Dharmani, and presumably was free to go from there to any place of safety she chose, but told Dharmani she would be more comfortable going back to her apartment. Thus, Tempongko's statements were not made primarily to obtain police assistance in a present, ongoing emergency, but rather to report an earlier, already completed assault. Accordingly, the statements were testimonial in nature, and should have been excluded under *Crawford*, *supra*, 541 U.S. 36, and its progeny.

Nonetheless, we decline to reverse appellant's conviction based on the error in admitting these statements. There was ample other evidence, which (as discussed *post*) was properly admitted, demonstrating appellant's history of domestic violence toward Tempongko prior to the murder, and her resulting fear of him. Moreover, appellant's behavior during the May 17, 1999 and November 18, 1999 incidents was more violent than the window breaking and hair pulling that Tempongko described to Dharmani on April 28, 1999. Thus, the hearsay evidence of Tempongko's statements to Dharmani was merely cumulative with regard to appellant's history of domestic violence, and not independently prejudicial because it was less serious than the other incidents. Accordingly, the trial court's error in admitting this evidence was harmless beyond a reasonable doubt. (*See People v. Livingston* (2012) 53 Cal.4th 1145, 1157–1160.)

*Beltran III*, 2013 WL 6498987, at *9–*11.

The record does not support Petitioner's argument that the events on November 18, 1999 more closely resemble the facts in *Hammon v. Indiana*, 547 U.S. 913 (2006), because the incident in question had been "completed," Pet. at 18, and that Petitioner's arrest that day was for "past behavior" and based on "historical information" supplied by Tempongko. The incident in question was ongoing when Lack arrived on the scene. Although the incident started with Petitioner's alleged fight with Tempongko, the incident continued after Tempongko's mother left

to call the police when Petitioner grabbed Tempongko by the shoulders, physically pushed her back into the bedroom, and kept her there against her will. *See* RT 182–88.  Tempongko did not exit the bedroom until after Lack and other police officers arrived and pulled Petitioner out of the bedroom. *See* RT 184.  Contrary to Petitioner's assertion, the events of November 18, 1999 more closely resemble the facts in *Davis v. Washington*, 547 U.S. 813 (2006), in that the questions asked by Officer Lack and the statements elicited from Tempongko "were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Davis*, 547 U.S. at 827.  Tempongko described the events of that day in order to explain the situation at hand and to explain her state of mind regarding being in the bedroom with Petitioner, *see* RT 183, 202–04, and not simply to "establish past conduct relevant to future criminal prosecution," Pet. at 25, as Petitioner alleges.  Moreover, the trial court only admitted the statements that Tempongko made to Officer Lack when she was released from the room, but excluded other statements relating to prior acts and the officer's recollection of a previous encounter with Petitioner.  *See* RT 202–07.  Accordingly, the state court's denial of this claim correctly applied Supreme Court precedent as set forth in *Davis v. Washington*, and was a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

In addition, the record does not support a finding that the admission of Tempongko's statements to Officers Lack or Dharmani[4] had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.  Tempongko's November 18, 1999 statements to Officer Lack were not the only evidence regarding Petitioner's prior instances of domestic violence.  Petitioner admitted that he had a felony domestic violence conviction from 1999.  *See* RT 1515, 1602.  The prosecution presented evidence that there was an emergency protective order requiring Petitioner to stay away from Tempongko's apartment, and that he violated that order on September 7, 2000.  *See* RT 1423–25, 1431, 1602.  The prosecution also presented evidence that Petitioner forcefully restrained Tempongko on May 17, 1999, and would

---

[4] This Court presumes correct the state court's finding that Tempongko's statements to Officer Dharmani violated the Confrontation Clause.

not release her until police arrived in response to a 911 call made by Teofilo Miranda. *See* RT 1279–88, 1414–21. With respect to the April 28, 1999 statements to Officer Dharmani, the record supports the state court's determination that Tempongko's statements to Officer Dharmani were cumulative to other evidence of Petitioner's history of domestic violence, including the above-referenced evidence regarding the November 18, 1999 incident and a 1999 felony domestic violence conviction, as well as evidence regarding the incident on May 17, 1999, *see* RT 1229–30, 1279–88, 1414–21.

Moreover, Petitioner does not dispute that he killed Tempongko. Petitioner's defense was that he killed Tempongko because she provoked him rather than out of malice. *See* RT 1709–16. However, the prosecution presented significant evidence undermining Petitioner's account of provocation, independent of Tempongko's statements to Officers Dharmani and Lack. Petitioner claimed that Tempongko called him the night of her death and asked him to come over. *See* RT 1522–26. However, Michael Houtz testified that Tempongko did not plan on meeting anyone the night of her death, *see* RT 1161, and Tempongko's son, Justin Nguyen (referred to as J.N. in the state appellate court opinion), testified that she did not expect or want Petitioner to come over that evening, *see* RT 1024, 1029. There was also evidence that Tempongko received phone calls from Petitioner that day which made her anxious, and that when Houtz dropped her and her children off that night, she fled his car because she feared that Petitioner might be near her home. *See* RT 1011–14, 1131–40, 1149–59. Petitioner claimed that Tempongko spontaneously provoked him by insulting him and his family, and by claiming that she had aborted his child. *See* RT 1528–31. However, Nguyen testified that Petitioner entered the apartment in an argumentative manner, and immediately began berating Tempongko and asking her where she had been all day. *See* RT 1031–40. Nguyen also testified that he did not recall Tempongko threatening or cursing Petitioner. *See* RT 1039. Finally, there was evidence indicating consciousness of guilt: Petitioner deliberately discarded in the trash the bloody sweatshirt he had been wearing when he stabbed Tempongko, *see* RT 632–33; Petitioner asked a club owner for a clean shirt, *see id.*; Petitioner took the time to say good-bye to his sister, *see* RT 781–85; Petitioner left for Mexico, staying there for six years, *see* RT 1438; and Petitioner did not return voluntarily to the United States and

United States District Court
Northern District of California

returned only pursuant to being arrested in Mexico pursuant to a warrant related to this case, *see id*. Any error in introducing Tempongko's statements to Officers Dharmani and Lack regarding Petitioner's prior acts of domestic violence did not have a substantial or injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637. This habeas claim is denied.

### c.     Tempongko's statements to Houtz

Petitioner argues that his rights under the Confrontation Clause were violated when the trial court admitted Tempongko's statements to Houtz. Pet. at 25–31. The state appellate court rejected this claim on remand as follows:

> The trial court permitted Houtz to testify about several statements that Tempongko made to him regarding appellant, ruling that these statements were admissible to show Tempongko's state of mind, as provided in Evidence Code section 1250 (section 1250). Appellant now contends that the challenged statements should not have been admitted, on three grounds: first, Tempongko's state of mind was not in issue, and the statements were not offered to prove or explain her acts or conduct; second, the statements in question were not "statement[s] of [Tempongko's] then existing state of mind, emotion, or physical sensation" (§ 1250); and third, even if admissible under section 1250, the evidence should have been excluded under section 352 as more prejudicial than probative. Our standard of review as to these contentions is abuse of discretion. (*See People v. Ortiz* (1995) 38 Cal.App.4th 377, 386 (*Ortiz*) ["The trial court is vested with broad discretion in determining the admissibility of evidence. [Citation.] This is particularly true where, as here, underlying that determination are questions of relevancy, the state of mind exception to the hearsay rule and undue prejudice. [Citation.] The lower court's determination will be reversed only upon a finding of abuse. [Citations.]"].)
>
> The specific testimony by Houtz to which appellant objects is as follows: (1) Tempongko told Houtz during the early months of their acquaintance that she had an ex-boyfriend (evidently referring to appellant); (2) during their outing to Sacramento on the day Tempongko was killed, her demeanor changed after she received a telephone call from appellant; (3) after getting that call, Tempongko said that appellant kept "bothering her"; (4) Tempongko told Houtz in early October 2000 that (a) in her mind, her relationship with appellant had been over since January 2000, but (b) he had not been willing to let her go; (5) Tempongko told Houtz that appellant (a) had not realized his relationship with her was over until recently, and (b) had told her before then that the end of their relationship would occur only over his or her dead body; and (6) when they neared her apartment building upon their return from the Sacramento trip, Tempongko told Houtz not to stop, and to drive around the block instead.
>
> Two of the statements at issue (items (2) and (6) in the above list) simply are not hearsay, and thus were properly admitted over appellant's hearsay objection. Houtz's testimony that Tempongko's demeanor changed after the telephone call is a description of his own observations, not a recitation of an out-of-court statement by Tempongko. His statement that Tempongko told him not to stop, but to drive around the block, is a report that Tempongko gave a request or command, not a recitation of an out-of-court statement of fact offered for its truth, and therefore also is not hearsay. [FN 17] These two items of evidence also cannot be characterized as

more prejudicial than probative, so even if appellant's objection under section 352 applied to them, the trial court was within its discretion in overruling it. Accordingly, our analysis of appellant's arguments about Houtz's testimony is confined to items (1), (3), (4), and (5) on the above list, which we will refer to collectively as the challenged statements.

> FN 17: Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing *and that is offered to prove the truth of the matter stated*." (Evid.Code, § 1200, subd. (a), italics added.) "Requests and words of direction generally do not constitute hearsay. [Citations.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289; see *People v. Alexander* (2010) 49 Cal.4th 846, 908 [defendant's girlfriend's statement that he asked her to determine accomplice's whereabouts and tell accomplice to "stay strong" was not hearsay, because offered not for truth, but for fact that defendant made request]; *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated."]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 [declarant's "words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].)

Appellant's first argument is that the challenged statements were not admissible under section 1250 because Tempongko's state of mind was not at issue. This contention shares a faulty premise with his argument, discussed *ante*, that the prior domestic violence evidence lacked probative value for the purpose of section 352. Like the prior domestic violence evidence, the challenged statements were relevant to show Tempongko's state of mind, i.e., that she wanted to end her relationship with appellant and was afraid of him. Appellant argues that Tempongko's state of mind did not make his theory of the case implausible, because she had previously continued to see appellant after he assaulted her, and had previously gotten back together with him despite her fear of him. These facts go to the weight of the challenged statements, however, and not to their admissibility.

We turn now to appellant's contention that the challenged statements were not admissible under section 1250 as statements of Tempongko's then existing state of mind, because they described behavior, attitudes, and words that Tempongko, in speaking to Houtz, attributed to appellant. Appellant's argument clearly does not apply to Tempongko's statements evidencing that in her view, her relationship with appellant was over (items (1) and (4)(a) on the list). Nor can it reasonably be argued that evidence of this attitude on Tempongko's part was more prejudicial than probative.

Appellant is correct, however, that the remaining statements—item (3) (appellant kept "bothering" Tempongko); item (4)(b) (appellant was not willing to let Tempongko go); and item (5) (appellant (a) did not realize his relationship with Tempongko was over, and (b) told her it would end only over his or her dead body)—did not expressly describe Tempongko's present state of mind, and therefore were not admissible under the state of mind exception as codified in section 1250. Respondent urges that these statements were nonetheless admissible, with an appropriate limiting instruction, as *non*-hearsay circumstantial evidence of Tempongko's state of mind.

In making this argument, respondent relies on the analysis set forth in *Ortiz*, *supra*, 38 Cal.App.4th at pages 385–395. As the *Ortiz* court cogently explained, "The statement: 'I am afraid of John,' is hearsay if offered to prove that the declarant fears John. If the declarant's state of mind is relevant, the statement is admissible

under section 1250. If a declarant says: 'John is dangerous,' the analysis becomes more difficult. If offered to prove John is dangerous, the statement is inadmissible hearsay. If, however, the statement is offered merely to prove the victim believed John to be dangerous, the statement is not offered for its truth (thus not hearsay) but merely as circumstantial evidence of the declarant's mental state. A similar result obtains when the statement describes conduct which the victim *believes* the appellant has engaged in. Examples include, 'John keeps calling my house and hanging up when I answer,' or 'John keeps driving by my house at night, but when I get to the window, he's gone.' The statement reflects a conclusion by the declarant which is manifestly unsupported by personal knowledge. However, if offered to prove the declarant's state of mind, the accuracy of the conclusion is irrelevant. If offered to prove a fearful state of mind of the declarant, what is important is not whether John actually engaged in the conduct, but that declarant believes he did. Certainly, there remains the question whether the declarant honestly believes John engaged in the reported conduct. However, a jury could find the declarant honestly believed John had engaged in the conduct without necessarily finding that John had, in fact, done so. A clear limiting instruction can, in large part, dispel prejudicial misuse of such evidence." (*Id.* at p. 390, original italics.) We will refer to the basis of admissibility for limited purposes described by the court in *Ortiz* as the *Ortiz* analysis.)

We agree with respondent that under the *Ortiz* analysis, the portions of the challenged statements in which Tempongko described appellant's attitudes and behavior were admissible, *with a proper limiting instruction*, as evidence that Tempongko believed the things she said about appellant, though not as evidence that the underlying facts were true. So construed, and with an appropriate instruction, these portions of the challenged statements were relevant to rebut appellant's provocation defense by showing Tempongko believed that appellant was resistant to their breakup (thus making it less likely that she would invite him over, only to end up berating him for abandoning her), and believed that he had threatened to harm her or himself if she insisted on separating from him (thus making it less likely that she would provoke him).

As to Tempongko's statements that appellant kept "bothering" her (item (3)), was not willing to let her go (item (4)(a)), and did not realize their relationship was over (item (5)(a)), the trial court gave a proper limiting instruction, telling the jury that Houtz's testimony "regarding comments made by [Tempongko] [is] not admitted for the truth of the fact asserted but only to be circumstantial evidence of her state of mind during the relevant time period...." As to Houtz's testimony about what Tempongko told him appellant had said to her, however (item (5)(b)), the trial court told the jury that "statements that are attributed to [appellant] are not limited to circumstantial evidence of state of mind[,] but come in for the truth of the fact asserted" if the jury found that appellant actually said them. [FN 18] As respondent commendably concedes, this was error under the *Ortiz* analysis. Thus, Houtz's testimony that Tempongko told him appellant said their relationship would end only over one of their dead bodies (the dead body statement) should not have been admitted for its truth (i.e., neither the truth of Tempongko's statement to Houtz that appellant had said this, nor the truth of appellant's statement itself). Before discussing whether this error was sufficiently prejudicial to require reversal of appellant's conviction, we first consider appellant's arguments that Houtz's testimony regarding Tempongko's statements, even if admissible under the *Ortiz* analysis, should have been excluded under section 352.

> FN 18: The record does not reflect that appellant's trial counsel objected to this instruction immediately before or after it was given. Before Houtz testified, however, the trial judge met with counsel in chambers to discuss

24

the testimony, and when the judge indicated during that conference that he intended to admit for their truth the statements Tempongko attributed to appellant, appellant's trial counsel stated that he had "a continuing objection," and the court responded "Yes." In addition, the record shows that an unreported sidebar conference occurred just when the prosecutor began the line of questioning that elicited Houtz's testimony about statements Tempongko attributed to appellant. Moreover, respondent does not contend the issue was waived. For all of these reasons, we conclude that appellant did not forfeit the right to challenge the propriety of this instruction on appeal.

Of the portions of the challenged statements admissible under the *Ortiz* analysis, the following are not particularly prejudicial: appellant "kept bothering" Tempongko; he was not willing to let her go; and he did not realize their relationship was over. As to these, the trial court was well within its discretion in concluding that their probative value regarding Tempongko's state of mind (that is, her attitude toward appellant) outweighed any potentially prejudicial effect. Thus, only item (5)(b)—the dead body statement—even potentially qualified as more prejudicial than probative. As to the dead body statement, we will assume, for the sake of argument, that the trial court not only erred in permitting it to come in for its truth rather than only as evidence of Tempongko's state of mind, but also erred by failing to exclude it under section 352.

This error, however, was not so egregious as to result in a fundamentally unfair trial. Accordingly, we assess its effect on the verdict under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*See People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"].)

The dead body statement indicated that Tempongko believed, prior to the day of her murder, that appellant might kill her if she did not reconcile with him. This statement had little or no bearing on appellant's provocation defense; rather, the potential prejudice that warranted the exclusion of this statement was that it could have led the jury to conclude appellant's killing of Tempongko was premeditated. This potential did not materialize, however. Even though the statement was admitted, the jury *acquitted* appellant of first degree murder.

In light of the totality of the evidence supporting appellant's conviction for *second* degree murder, we are not persuaded it is reasonably probable that if the dead body statement had not been admitted, its absence would have made the jury more likely to believe appellant's provocation defense, or more likely to consider the provocation adequate, so as to reduce appellant's crime to voluntary manslaughter. (*See Beltran*, *supra*, 56 Cal.4th at pp. 956–957 [evidence of provocation was weak and contradicted; evidence supporting murder conviction was strong].) Accordingly, any error in admitting the dead body statement is not grounds for reversing appellant's conviction.

*Beltran III*, 2013 WL 6498987, at *13–*16.

As an initial matter, Respondent incorrectly argues that this claim is unexhausted.

Petitioner presented this claim in his state petition for review dated January 9, 2014.  *See*

Respondent, Ex. I (Petition for Review) at 25.  He titled this claim as follows:

United States District Court
Northern District of California

> Review is required on an issue of substantial importance: Did the trial court commit reversible error by admitting the hearsay evidence of statements made by the victim, which were not admissible pursuant to the state of mind exception to the hearsay rule in violation of appellant's Sixth Amendment right of confrontation?

*Id.*  Although Petitioner did not go on to discuss his federal claim in the body of the petition, the manner in which he titled his claim was sufficient to "alert the California Supreme Court to the federal nature of his claim, and thus to provide that court with a 'fair opportunity' to address it." *Caswell v. Calderon*, 363 F.3d 832, 838–39 (9th Cir. 2004) (quoting *Peterson v. Lambert*, 319 F.3d 1153, 1158 (9th Cir. 2003)) (finding claims exhausted where, in his petition for review to the state supreme court, petitioner identified the factual predicate for his challenge, referred to the federal constitution, and referred to a case discussing the federal due process clause).  Petitioner has therefore properly exhausted this claim.  *See id.*

The state court only discussed the state law basis for rejecting this claim.  *Beltran III*, 2013 WL 6498987, at *21.  Where a federal claim has been presented to the state court and the state court denied all relief without specifically addressing the federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011); *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (order that discusses state law claim but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to § 2254(d)).  In that case, we "must determine what arguments or theories . . . could have supported" the state court's rejection of the federal claim, and then give deference to those arguments or theories under AEDPA.  *Harrington*, 562 U.S. at 102.

Keeping this principle in mind, the Court concludes that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  Nor was this conclusion based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Petitioner argues that Tempongko's statements to Houtz were inadmissible hearsay, because they did not fall within the state of mind exception to the hearsay rule set forth in section 1250 of the California Evidence Code, *see* Pet. at 25–29, and were unduly prejudicial in violation of section 352 of the California Evidence Code,

1    *see id.* at 30–31.  He further argues that the trial court's admission of these statements, whether

2    admissible or not, violated his rights under the Confrontation Clause.  *See id.* at 25.

3         To the extent that Petitioner challenges the admission of Tempongko's statements to Houtz

4    as inadmissible under sections 352 or 1250 of the California Evidence Code, *see* Pet. at 25–29 and

5    30–31, this argument is based solely on the interpretation of state law and is not cognizable in this

6    action.  *See Estelle*, 502 U.S. at 67–68 (holding that mere errors in the application of state law are

7    not cognizable on habeas corpus); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.

8    1991) ("[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient

9    basis for granting habeas relief.").

10         For purposes of Petitioner's Confrontation Clause claim, whether Tempongko's statements

11    to Houtz were admissible is not dispositive.  The Confrontation Clause does not necessarily bar

12    the admission of all hearsay statements.  *Crawford*, 541 U.S. at 51.  Rather, the question is

13    whether Tempongko's statements to Houtz constituted an out-of-court testimonial statement

14    offered for the truth of the matter asserted, i.e., "testimonial hearsay."  *Id.*  A statement is

15    testimonial when it is """"made under circumstances which would lead an objective witness

16    reasonably to believe that the statement would be available for use at a later trial.""""  *Melendez–*

17    *Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51); *see also Michigan v. Bryant*, 131 S. Ct.

18    1143, 1155 (2011).  Here, Tempongko's statements were made to Houtz in the course of their

19    everyday interactions.  The Supreme Court has recognized that "[s]tatements to friends and

20    neighbors about [domestic] abuse and intimidation" do not constitute testimonial hearsay that

21    would be barred by the Confrontation Clause.  *See Giles v. California*, 554 U.S. 353, 376 (2008);

22    *see also Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government

23    officers bears testimony in a sense that a person who makes a casual remark to an acquaintance

24    does not."); *Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) (finding that "the state

25    court's implicit conclusion that [victim's] remarks to her coworkers did not implicate

26    [petitioner's] Sixth Amendment rights of confrontation was not contrary to, nor an unreasonable

27    application of *Crawford*") (citing 28 U.S.C. § 2254(d)(1)).

28         Accordingly, this habeas claim is denied.

United States District Court<br>Northern District of California

1

2.      **Admission of Prior Domestic Violence Incidents**

2          Petitioner argues that evidence of prior incidents of domestic violence was erroneously

3   admitted, thereby violating his due process rights and rendering his trial fundamentally unfair.

4   Pet. at 20–22.  The state appellate court rejected this claim on remand as follows:

5              Appellant contends that the trial judge erred in admitting evidence of what
           appellant characterizes as "four alleged incidents of domestic violence" between
6          himself and Tempongko, under the authority of Evidence Code section 1109. The
           evidence at issue actually consisted of three incidents of domestic violence and one
7          violation of a protective order against domestic violence, all of which we will refer
           to collectively as the prior domestic violence evidence. Appellant's position is that
8          the risk of undue prejudice from the prior domestic violence evidence outweighed
           its probative value, so that it should have been excluded under Evidence Code
9          section 352 (section 352). Our standard of review on this issue is abuse of
           discretion. (*See People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; *People v.*
10         *Rucker* (2005) 126 Cal.App.4th 1107, 1119–1120.)

11             Appellant contends that the prior domestic violence evidence lacked any probative
           value because it was irrelevant to how Tempongko died. This argument ignores the
12         relevance of this evidence to appellant's defense, which was that Tempongko asked
           him to come to her apartment that night, and provoked him by telling him that she
13         had aborted her pregnancy in the belief he would eventually leave her. This defense
           placed at issue the state of mind of both appellant and Tempongko, and the prior
14         domestic violence evidence had probative value on both. As respondent points out,
           by showing that appellant had a propensity for domestic violence, as permitted by
15         Evidence Code section 1109, the prior domestic violence evidence tended to
           undercut appellant's contention that he stabbed Tempongko only because her
16         provocation triggered in him a mental state negating malice.

17             Similarly, Tempongko's state of mind regarding appellant and her relationship with
           him was directly relevant to the plausibility of appellant's version of the facts. In
18         this respect, this case is similar to *People v. Escobar* (2000) 82 Cal.App.4th 1085,
           1092, 1102–1104 (*Escobar*), in which the defendant argued that his killing of his
19         wife was voluntary manslaughter because she provoked him by revealing her
           infidelity, insulting him, and kicking him. In that case, this court concluded that the
20         wife's prior statement to a friend that she wanted to leave the defendant, but was
           afraid he would kill her, was admissible to rebut the defendant's claim of
21         provocation by showing the wife's fear of him, making it unlikely that she would
           provoke him in the manner he described. Here, the prior domestic violence
22         evidence showed that Tempongko wanted to end her relationship with appellant,
           and was afraid of him, thereby making it less likely that she would invite him over
23         to her apartment, much less make highly provocative comments to him once he
           arrived. Thus, here as in *Escobar*, the challenged evidence had probative value in
24         tending to rebut appellant's defense, and was admissible for that purpose.

25             Appellant further argues that the prior domestic violence evidence was unduly
           prejudicial, because it tended to evoke an emotional bias against him on the part of
26         the jury. In view of the undisputed fact that appellant stabbed Tempongko to death
           in front of her two young children, it is highly unlikely that the jury was unfairly or
27         unduly influenced by hearing evidence that appellant had previously committed
           acts against Tempongko of a non-lethal nature. Accordingly, we find no abuse of
28         discretion in the trial court's decision that the probative value of the prior domestic

United States District Court
Northern District of California

violence evidence outweighed its prejudicial effect. (*See Escobar*, *supra*, 82 Cal.App.4th at p. 1097 [prior incident of domestic abuse unlikely to have significant impact on jury in context of undisputed evidence of defendant's "extraordinarily violent conduct" in killing wife]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 [no danger of jury confusion where prior incidents of domestic violence were no more egregious than charged offense]; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1338 [evidence of prior domestic violence properly admitted where not inflammatory, and less serious than charged act].) Accordingly, the admission of this evidence was not error.  [FN 16]

> FN 16: Appellant also contends that the admission of the prior domestic violence evidence rendered his trial fundamentally unfair, in violation of his federal due process rights. Appellant recognizes that this argument is vitiated by *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [admission of prior uncharged sex offenses under statute similar to Evid.Code, § 1109 did not violate due process], but explains that he raises it to preserve it for federal review. We acknowledge that this issue has been properly raised and preserved at this stage of the proceedings.

*Beltran III*, 2013 WL 6498987, at *11–*12.

After carefully reviewing the record, the Court concludes that the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  A federal writ of habeas corpus will not be granted for an erroneous admission of evidence unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  Evidence violates due process only if "there are *no* permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original).  Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process.  *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).  Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established

United States District Court
Northern District of California

federal law under § 2254(d)).  Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."  *Id.* (quoting 28 U.S.C. § 2254(d)).  In addition, the Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991); *see also Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006) (recognizing that the Supreme Court has expressly concluded that whether a petitioner's due process right is violated by the admission of propensity advice is an "open question").  Pursuant to these binding authorities, the state appellate court's rejection of Petitioner's due process claim here does not support the granting of federal habeas relief under AEDPA because a California trial court's admission of evidence pursuant to section 1109 of the California Evidence Code to show propensity does not violate any principle of clearly established federal law.  *Holley*, 568 F.3d at 1101.

Even if the admission of the prior domestic violence events had been erroneous, the record does not support a finding that the admission had a substantial or injurious effect in determining the jury's verdict.  *See Brecht*, 507 U.S. at 637.  Petitioner argues that evidence of the prior domestic violence events created a substantial risk that the jury would convict Petitioner for being a "bad person," without regard for his guilt of the charged offense.  *See* Pet. at 21.  Petitioner's argument is unsupported by the record.  As discussed *supra* in Section III.B.1.b, the prosecution presented significant evidence undermining Petitioner's account of provocation.  Moreover, the Court agrees with the state court's finding that it is highly unlikely that the jury was unfairly or unduly influenced by Petitioner's past domestic violence acts, all of a non-lethal nature, when confronted with the fact that Petitioner stabbed Tempongko to death in front of her two young children.  Accordingly, this habeas claim is denied.

### 3.    Instructional Error

Petitioner argues that Judicial Council of California Criminal Jury Instruction number 852 [hereinafter CALCRIM 852] effectively reduces the prosecution's burden of proof and that the trial court therefore committed instructional error by giving CALCRIM 852.  Pet. at 22–25.  The

state appellate court on remand addressed the claim as follows:

> The trial court instructed the jury regarding the relevance and permissible use of the prior domestic violence evidence by giving CALCRIM No. 852. [FN 20] Appellant contends that this instruction improperly reduces the prosecutor's burden of proof, and misleads the jury. Appellant's counsel is commendably forthright in acknowledging that the same contentions were rejected with reference to an equivalent instruction in *People v. Reliford* (2003) 29 Cal .4th 1007, 1012–1016 [upholding CALJIC No. 2.50.01], and with reference to CALCRIM No. 852 itself in *People v. Johnson* (2008) 164 Cal.App.4th 731, 739 (Cantil–Sakauye, J.). Respondent points out that CALCRIM No. 852 was also upheld as against a similar challenge in *People v. Reyes* (2008) 160 Cal.App.4th 246, 250–253. Appellant has raised these issues solely to preserve them for federal review, and  we need only acknowledge, which we hereby do, that the issues were properly raised before us and have been preserved.
>
> > FN 20: The pertinent portion of this instruction, as read to the jury in this case, was as follows: "If you decide the defendant committed the uncharged domestic violence described in testimony, you may but are not required to conclude from that evidence that the defendant is disposed or inclined to commit domestic violence; and, based on that decision, also conclude the defendant was likely to have committed the homicide charged in this case. [¶] If you conclude the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove the defendant is guilty of a homicide. The People must prove each element of every charge beyond a reasonable doubt."

*Beltran III*, 2013 WL 6498987, at *17.

### a.  Legal Standard

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  A jury instruction violates due process if it fails to give effect to the requirement that the state must prove every element of the offense beyond a reasonable doubt.  *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right].") (quoting *Cupp*, 414 U.S. at 146).  The instruction may not be judged in

United States District Court
Northern District of California

1    artificial isolation, but must be considered in the context of the instructions as a whole and the trial

2    record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the

3    context of the overall charge to the jury as a component of the entire trial process.  *United States v.*

4    *Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

5            **b.     Analysis**

6            Since the state court only referenced state law in rejecting this claim, *Beltran III*, 2013 WL

7    6498987, at *17, the Court once again follows the Supreme Court's direction and "determine[s]

8    what arguments or theories . . . could have supported" the state court's rejection of the federal

9    claim, and then gives deference to those arguments or theories under AEDPA.  *Harrington*, 562

10   U.S. at 786.

11           After a careful review of the record and the relevant case law, the Court concludes that the

12   Petitioner is not entitled to federal habeas relief based on his suggestion that CALCRIM No. 852

13   impermissibly lowered the prosecution's burden of proving his guilt beyond a reasonable doubt.

14   CALCRIM 852 explicitly instructed the jury that if it found that Petitioner committed the

15   uncharged acts of domestic violence, that finding was only one factor to consider along with all

16   the other evidence and was not "sufficient by itself to prove [Petitioner] guilty of [the charged]

17   homicide.  The People must still prove each element of every charge beyond a reasonable doubt."

18   14 RT 1673.   There is no "reasonable likelihood" that the jury applied the challenged instruction

19   in a way that lowered the prosecution's burden of proof.  *See Estelle*, 502 U.S. at 72; *accord*

20   *Luster v. Swarthout*, No. CV 10-02681 CAS (SS), 2012 WL 5347838, *12 (C.D. Cal. Aug.

21   30,2012) ("There is simply no likelihood that the jury understood CALCRIM No. 852 to relieve

22   the prosecution of its burden of proof.").  Petitioner is not entitled to habeas relief on this claim.

23   *See also Foster v. Valenzuela*, No. C 14-0051 CRB (PR), 2015 WL 1737829, at *8 (N.D. Cal.

24   Apr. 10, 2015) (CALCRIM 852 did not lower prosecution's burden of proof); *Johnson v.*

25   *Dickinson*, No. 2:10-CV-01251-JKS, 2012 WL 468377, at *9 (E.D. Cal. Feb. 13, 2012) (petitioner

26   was not entitled to habeas relief on his claim that CALCRIM 852 impermissibly lowered the

27   prosecution's burden of proof); *Brady v. Swarthout*, No. SACV 11-370-MWF (AGR), 2013 WL

28   4666337, at *7 (C.D. Cal. Aug. 29, 2013) (same); *Simmons v. Hedgpeth*, No. 10CV1795-DMS

United States District Court
Northern District of California

32

1    (BGS), 2012 WL 5966648, at *9 (S.D. Cal. Oct. 10, 2012) *report and recommendation adopted*

2    *sub nom. Simmons v. Cate*, No. 10CV1795 DMS (BGS), 2012 WL 5954648 (S.D. Cal. Nov. 28,

3    2012) (same); *Suniga v. McDonald*, No. 1:10-CV-00090 LJO GSA HC, 2012 WL 893148, at *18

4    (E.D. Cal. Mar. 14, 2012) (same).

5        **4.**    **Prosecutorial Misconduct**

6        Petitioner claims that the prosecutor committed misconduct when she knowingly elicited

7    inadmissible testimony, and that the admission of that inadmissible testimony violated his due

8    process rights.  Pet. at 31–34.  The state appellate court rejected this claim on remand as follows:

> Appellant argues that the prosecutor committed misconduct during the direct examination of Houtz. The factual background of this argument is as follows. Prior to trial, the court ruled that Houtz could not be asked about what Tempongko told him about why she broke up with appellant, and in particular, about any statements she made about appellant assaulting her. Despite this ruling, the prosecutor asked Houtz on direct examination whether Tempongko had told Houtz why she broke up with her previous boyfriend (i.e., appellant). The trial court sustained defense counsel's objection to this question, and Houtz did not answer it. The prosecutor then asked whether Tempongko had ever told Houtz "anything about her fear of her boyfriend that she had broken up with." Defense counsel again objected before Houtz could answer, and the trial court sustained the objection and called counsel up to the sidebar for an unreported conference. The prosecutor then moved on to another line of questioning.
>
> In light of the pretrial ruling, the two questions described in the preceding paragraph were clearly inappropriate. However, defense counsel's objections to them were sustained, and the prosecutor did not persist. [FN 21] Moreover, any inference the jury might have drawn from the prosecutor's questions themselves was cumulative of ample, properly admitted evidence as to appellant's history of domestic violence against Tempongko, and as to her state of mind regarding appellant during the day that ended in her death. Accordingly, the prosecutor's violation of the court's pretrial ruling in this regard, while regrettable, was harmless beyond a reasonable doubt. (*See People v. Hinton* (2006) 37 Cal.4th 839, 863–864.)
>
> > FN 21: As pointed out in respondent's brief, the trial court itself later asked Houtz a narrower line of questions about Tempongko's statements about the breakup during her trip to Sacramento with Houtz and the children. Appellant acknowledges in his reply brief that no prosecutorial misconduct claim can be premised on this aspect of Houtz's testimony.

*Beltran III*, 2013 WL 6498987, at *18.

    **a.**    **Legal Standard**

    Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard

of review is the narrow one of due process and not the broad exercise of supervisory power.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated

United States District Court
Northern District of California

33

United States District Court
Northern District of California

1   when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455

2   U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial

3   misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the

4   first issue is whether the prosecutor's remarks were improper; if so, the next question is whether

5   such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.

6   2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that *Darden* is

7   the clearly established federal law regarding a prosecutor's improper comments for AEDPA

8   review purposes).  A prosecutorial misconduct claim is decided "on the merits, examining the

9   entire proceedings to determine whether the prosecutor's remarks so infected the trial with

10  unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63

11  F.3d 926, 929 (9th Cir. 1995) (quoting *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991)).

12              **b.      Analysis**

13          Petitioner alleges that the prosecutor committed misconduct because she asked three

14  questions that violated the trial court's pre-trial ruling limiting the scope of Houtz's permissible

15  testimony and that ultimately elicited testimony from Houtz that Petitioner could not accept

16  Tempongko's termination of their relationship.  Pet. at 31–33.  Petitioner alleges that this

17  testimony prejudiced him because it contradicted his defense that "[Petitioner and Tempongko]

18  were on friendly terms and the violence was the result of provocation of [Tempongko] telling him

19  that she had aborted his child." *Id.* at 35.   After carefully reviewing the record, the Court

20  concludes that the state appellate court's denial of this claim was neither contrary to, nor an

21  unreasonable application of, clearly established Supreme Court precedent.  Nor was the state

22  appellate court's denial of this claim based on an unreasonable determination of the facts in light

23  of the evidence presented in the state court proceeding.

24          The first two questions were asked towards the beginning of Houtz's direct examination.

25  The prosecutor asked Houtz, "And did [Tempongko] tell you why she broke up with him?"  RT

26  1121.  Defense counsel objected to this question on the grounds of relevance and section 352 of

27  the California Evidence Code. *Id.*  The trial court immediately sustained the objection. *Id.*  The

28  prosecutor then asked Houtz, "Did she ever tell you anything about her fear of her boyfriend that

34

she had broken up with?"  *Id.*  Defense counsel again interposed the same objections.  *Id.*  The trial court again sustained the objection.  *Id.*  The prosecutor then proceeded to ask Houtz questions about his trip to Sacramento with Tempongko and her children on the day of her murder.  RT 1121–40.  The prosecutor then asked Houtz whether Tempongko had shared information with him about the status of her relationship with Petitioner and whether she had been able to end the relationship with Petitioner.  RT 1140.  Defense counsel objected again on the same grounds.  *Id.*  The trial court overruled the objection and proceeded to take over the questioning, asking Petitioner whether Tempongko said "anything specifically regarding the ease of the breakup."  *Id.*  Houtz answered, "In her mind it was over in January but he would not let her go."  *Id.*  In answering a follow-up question, Houtz confirmed that in the two weeks prior to the Sacramento trip, Tempongko told him that Petitioner realized that the relationship was completely over.  *Id.*  On cross-examination, defense counsel elicited testimony from Houtz that Tempongko told him that, by two weeks prior to the Sacramento trip, Petitioner had accepted the fact that the relationship was over.

Assuming arguendo that the prosecutor's questions were improper, there was no due process violation because the trial court issued a curative instruction.  Before the jury began deliberations, the trial court instructed the jury that the attorneys' questions were not evidence, and that if the court sustained an objection to an attorney's question, the question should be ignored.  *See* RT 1657–58.  Accordingly, as directed by the Supreme Court, the Court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *see also Darden*, 477 U.S. at 182 (condemning egregious, inflammatory comments by the prosecutor but holding that the trial was fair because the trial judge took curative); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges.").  Although this presumption may be overcome, Petitioner has shown neither the requisite "overwhelming probability" that the jury was unable to disregard evidence nor a strong likelihood that the effect of the misconduct was "devastating" to him.  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115–16 (finding trial fair where jury received instructions five different times to consider only the evidence presented and not sympathy for the victim's life

story).

Moreover, the record does not support a finding that the prosecutor's questions had a substantial or injurious effect in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. There was evidence outside of the prosecutor's questions that indicated that Tempongko and Petitioner were not on friendly terms at the time of the murder, and that Petitioner had not been accepting of the end of their relationship. She had previously obtained a protective order against Petitioner, *see* RT 1423–25, 1431, 1602; Nguyen testified that Tempongko received phone calls from someone the night of the murder and she asked the caller to not come to the house, *see* RT 1029; and Houtz testified that when he dropped Tempongko off she asked him to circle the block and then ran into her apartment in a panic, *see* RT 1150–59. And, as discussed *supra* in III.B.1.b, the prosecution presented significant evidence undermining Petitioner's defense of provocation.

However, Petitioner argues that his due process rights were violated not just by the allegedly improper questioning but also by the allegedly inadmissible testimony elicited by the improper questioning.[5] The record contradicts the factual basis for Petitioner's claim. The allegedly improper questions posed by the prosecutor did not elicit the allegedly imadmissible testimony. The challenged questions took place at the beginning of Houtz's direct examination. Following these questions, the prosecutor then proceeded to ask about Tempongko and Houtz's trip to Sacramento before asking Houtz whether Tempongko had shared information with him about the status of her relationship with Petitioner and whether she had been able to end the relationship with Petitioner. At that point, the trial court took over the questioning. Houtz's testimony that Petitioner claims was inadmissible and prejudicial was elicited by the trial court and not by the prosecutor.

Accordingly, this habeas claim is denied.

### 5.     Cumulative Error

Petitioner claims that the cumulative effect of the errors so infected the trial with

---

[5]In the briefing which he submitted to the state appellate court, Petitioner acknowledged that no prosecutorial misconduct could be premised on Houtz's testimony that responded to the trial court's questioning. *See* Respondent's Ex. D at 70 n.3.

unfairness that he was denied his due process right to a fair trial.  The state appellate court on

remand rejected Petitioner's cumulative error claim as follows:

> [Petitioner] contends that even if the individual trial errors he has identified do not warrant reversal of his conviction, their cumulative effect deprived him of a fair trial.  We have rejected most of [Petitioner]'s claims of error, and concluded that each of the few errors that did occur was individually harmless. For the same reasons discussed in connection with the individual errors, and in light of the record as a whole, we are not persuaded that [Petitioner] was deprived of his right to a fair trial. We therefore decline to reverse on the ground of cumulative error.

*Beltran III*, 2013 WL 6498987 at *18.

### a.     Legal Standard

The Ninth Circuit has held that in exceptional cases, although no single trial error is

sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may

prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*,

334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors

hindered defendant's efforts to challenge every important element of proof offered by

prosecution).  Cumulative error is more likely to be found prejudicial when the government's case

is weak.  *See id.*

### b.     Analysis

The state appellate court rejected Petitioner's cumulative error claim, noting that none of

the errors in the case caused any significant prejudice to Petitioner either individually or

cumulatively.  *Beltran III*, 2013 WL 6498987 at *18.  It is also important that the state court found

no error of constitutional magnitude.  *Cf. Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if "no

error of constitutional magnitude occurred, no cumulative prejudice is possible").

Under the circumstances, it simply cannot be said that the state court's rejection of

Petitioner's cumulative error claim was contrary to, or an unreasonable application of, clearly

established Supreme Court precedent, or was based on an unreasonable determination of the facts.

*See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on his claim of

cumulative error.

## C.     Certificate of Appealability

United States District Court
Northern District of California

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### III. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Ron Davis on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated:  December 4, 2015

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California